**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**NICHOLAS S. MESSER,**

        **Plaintiff,**

   v.                              **Civil Action 2:18-cv-972
Judge James L. Graham
Magistrate Judge Jolson**

**COMMISIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Nicholas S. Messer, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 8) be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I. BACKGROUND**

Plaintiff filed his application for SSI on July 30, 2015, alleging that he was disabled beginning July 18, 2012. (Doc. 7, Tr. 188–92). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held the hearing on December 12, 2017. (Tr. 35–68). On March 16, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 10–20). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on August 29, 2018 (Doc. 1), and the Commissioner filed the administrative record on November 9, 2018 (Doc. 7). Plaintiff filed his Statement of Errors (Doc. 8) on December 20, 2018, Defendant filed

an Opposition (Doc. 9) on January 31, 2019, and Plaintiff filed his Reply (Doc. 10) on February 11, 2019. Thus, this matter is now ripe for consideration.

A. **Relevant Hearing Testimony**

Plaintiff's Statement of Errors concerns his mental health, and as such, the Court examines the hearing testimony pertaining to the same.

At the time of the hearing, Plaintiff was 23 years old. (Tr. 41). Plaintiff lives with his grandmother. (Tr. 51). Plaintiff testified that he has never worked a full-time job because his mental health problems prevent him from working. (Tr. 43–44). Plaintiff explained that, for example, he is anxious "that [he] might fail" and does "not want[] to associate with people or even be around them if [he] can prevent it at all." (Tr. 44). He also explained that he "get[s] nervous" about choking on his medication, about getting hurt while cooking, and about getting into an accident while driving. (Tr. 44–45). When asked to explain his "fear of failure," Plaintiff stated:

> Well, in everyday when I play things like video games because that's primarily what I do most of the day, things like if I'm in a group of people and we're trying to have something accomplished I'm afraid I'm not doing my part or whatever the goal I have set in mind is for me I'm not doing it successfully enough or as efficiently as I can.

(Tr. 45)

Plaintiff also testified that his anxiety makes him "jittery" and that he "start[s] shaking" when anxious. (Tr. 46). When asked about the "major symptoms" of his diagnosis of narcissistic personality disorder and schizoid personality disorder, Plaintiff explained that he "get[s] very emotionally detached and not interested in what the other person is saying" and just wants to leave the situation. (Tr. 47–48). Plaintiff further testified that he avoids going to the store, and that when he does grocery shop he experiences anxiety being around other people. (Tr. 50). Consequently, Plaintiff's grandmother helps with some of the grocery shopping. (*Id*.). When describing the symptoms of his depression, Plaintiff explained that he experiences "overwhelming

sadness," does not want to get out of bed, and sometimes does not want to take his medicine. (Tr. 52). Plaintiff testified that, because of his depression, he prefers to spend his days alone in his room. (*Id*.). Plaintiff also experiences paranoia, which he describes as "very cluttered thoughts" and "stress or worry about things that might happen next." (Tr. 55).

As for household tasks, Plaintiff testified that he does not help his grandmother because he wants to avoid any interaction with her. (Tr. 58). With regard to daily activities, Plaintiff stated that he watches music videos on YouTube, plays video games, and watches movies on Netflix. (Tr. 59). He likes these activities because "in the video games or movies, you know, things always tend to work out perfectly or the way that they should, so it's just a little bit easier when it's not me I have to deal with then it's I'm just watching other people do it and, you know, they're having fun trying things like that." (Tr. 59–60). When asked what exactly would cause him to be unsuccessful at work, Plaintiff responded:

> Well, I would say most days I wouldn't even go. I would wake up completely disinterested in going at all. Even if I did go I would probably try to avoid any kind of conversation I can with anybody. I know like there's certain like sales representatives or anyone that would help with sales or store clerk or anything I know it's going to be impossible for me to do. . . . The fear of trying to get to work, maybe if it's snowy and the roads might be slick I probably wouldn't even go in fear of being a wreck for me messing up. If it's rainy I might be a little bit worried that the road might be slick. The unknown of you don't know how many people you're going to interact with if you have to interact with anybody. The fear that I might mess up in doing something that's part of the job, how severe the mess up is going to be. Yeah, there's plenty of things.

(Tr. 60–61).

Finally, a Vocational Expert ("VE") testified that Plaintiff could perform the occupations of weights/measures checker and a hand sorter/grater. (Tr. 63).

B. **Relevant Medical Background**

As noted, Plaintiff's Statement of Errors concerns his mental health, and as such, the Court examines the medical evidence pertaining to the same.

3

On July 29, 2014, Plaintiff saw primary care physician, Dr. Boyd, for the first time. (Tr. 271 (noting "New pt Needs Family Doctor Wants paper stating there is something wrong with him so they can get food stamps")). At the appointment, Dr. Boyd asked Plaintiff a series of questions as part of a depression screening. (*Id*.). Based on his responses, Plaintiff received a score of 24, indicating "severe depression." (*Id*.). Plaintiff's mother, who also attended the appointment, stated that "'he's the most depressed person'" she's ever known and that he does not leave his room. (*Id*.). Dr. Boyd further noted that Plaintiff admitted to having had suicidal plans in November 2013 and that he "admits [he is] paranoid; identifies with 'narcissistic personality type'- sees himself as superior to others." (Tr. 272). Dr. Boyd referred Plaintiff to Jannat Wolfe, a licensed clinical social worker. (*Id*.).

On July 30, 2014, Plaintiff saw Jannat Wolfe for his depression. (Tr. 269). Her notes indicate that Plaintiff had no suicidal or homicidal thoughts and admitted to symptoms of depression. (*Id*.). Plaintiff told Ms. Wolfe that "he thinks of himself as a '0' in terms of having value and looks at almost everyone else as a 'minus.'" (*Id*.). He also told her that he has respect only for his mother, Dolly Parton, and Oprah Winfrey. (*Id*.). Plaintiff told Ms. Wolfe that he applied for disability one year ago but was denied, that his mother had to file for bankruptcy, "and that they are having serious financial difficulties." (*Id*.).

On September 16, 2014, Plaintiff told Dr. Boyd that he expressed suicidal ideations to his mom but did not have a plan to harm himself because it would be too hurtful for his family. (Tr. 268). At that appointment, Dr. Boyd prescribed Plaintiff Lexapro. (*Id*.). Plaintiff saw Dr. Boyd again on December 5, 2014. (Tr. 266). At that appointment, Plaintiff's mother thought the Lexapro was helping but Plaintiff stated that he did not notice a difference and had not taken his medication for weeks. (*Id*.). Dr. Boyd observed that Plaintiff had not yet seen a psychiatrist,

4

noting "I would advocate for psychiatry consultation to confirm diagnosis [of schizoid personality disorder]." (*Id.*).

Mental health records from September 25, 2015, provide that Plaintiff was able to practice "calming strategies and ways to counter negative thinking." (Tr. 291). On February 12, 2016, Plaintiff underwent a consultative psychological evaluation to assess his mental status as it related to his claim for disability benefits. (Tr. 310). Based on that evaluation, Plaintiff was diagnosed with generalized anxiety disorder and persistent depressive disorder (moderate). (Tr. 314).

On September 8, 2016, Dr. Boyd completed a Mental Impairment Questionnaire. (Tr. 338–40). On the form, Dr. Boyd indicated that he had treated Plaintiff for two years and listed his diagnoses as schizoid personality disorder, narcissistic personality disorder, and depression. (Tr. 338). Dr. Boyd checked a series of boxes underneath "symptoms," including pervasive loss of interest in almost all activities, feelings of guilt or worthlessness, paranoid thinning, and inflated self-esteem. (*Id.*). Dr. Boyd opined that Plaintiff would be absent more than four days per month. (*Id.*). Dr. Boyd also completed a mental residual functional capacities checklist and indicated that Plaintiff had extreme difficulties in a number of areas, including, getting along with others without exhibiting behavioral extremes and completing a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 339–40).

### C. The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful employment since July 30, 2015, the application date. (Tr. 12). The ALJ determined that Plaintiff suffered from the following severe impairments: major depressive disorder, schizoid personality disorder; autism spectrum disorder; narcissistic personality disorder; asthma; and obesity. (Tr. 13). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or

medically equaled a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except occasional climbing ramps/stairs, but never climbing ladders, ropes, or scaffolds. The claimant must avoid exposure to extreme temperatures, humidity, fumes, odors, dusts, gases, and poor ventilation. The claimant must avoid hazards, including unprotected heights and dangerous machinery. The claimant is limited to simple, routine, repetitive tasks, but no production paced or quota driven work. The claimant can perform goal-oriented jobs, such as an office cleaner. The claimant can make simple workplace decisions. The claimant must avoid interacting with general public and coworkers, but can have occasional, superficial interaction with supervisors. The claimant is limited to a static work environment.

(Tr. 14–15). With regard to the mental health evidence, the ALJ concluded:

> In consideration of the totality of the evidence of record, including, but not limited to the claimant's conservative and routine treatment, multiple benign mental status findings, and the claimant's activities of daily living, the undersigned finds that the claimant has moderate limitations in understanding, remembering, or applying information; moderate to marked limitations in interacting with others; moderate limitations with regard to concentrating, persisting or maintaining pace; and moderate limitations regarding adapting or managing oneself.

(Tr. 14).

The ALJ then concluded that Plaintiff's mental health symptoms are "not so severe that significant treatment was warranted" and found that his "mental evaluation findings do not support the severity, frequency, or intensity of limitations alleged by the claimant." (Tr. 16).

The ALJ also discussed Plaintiff's daily activities:

> Moreover, the claimant is able to perform a wide range of activities of daily living that are not consistent with someone who is disabled. The activities are documented by the claimant's testimony at the hearing and the evidence of record. For example, the evidence shows that the claimant plays video games, listens to music, and uses his computer daily; he can perform household chores and prepare meals, though his family primarily performed these tasks for him; and he could tend to his daily hygiene and grooming (Exhibit B7F/6; B6F). The claimant also was able to relate well at the hearing to his representative, as well as the undersigned and the hearing reporter, who were unknown.

The fact that the claimant can perform these activities of daily living is not supportive of a finding of disability. Further, it appears that despite his impairments, he has engaged in a somewhat normal level of daily activity. Moreover, the claimant's activities of daily living, as well as his treatment history support no greater "paragraph B" functional limitations than described above. It should be noted that the physical and mental capabilities requisite to performing many of the tasks described above replicate those necessary for obtaining and maintaining employment.

(Tr. 17).

Finally, the ALJ weighed the opinion evidence, starting with Plaintiff's primary care physician, Dr. Boyd. (*Id.*). The ALJ had the following to say about Dr. Boyd's opinion:

As for the opinion evidence, the claimant's primary care physician, Dr. Boyd repeatedly reported that the claimant remained unemployable and was totally, permanently disabled (Exhibits B1F/12; B8F).

Furthermore, on May 11, 2016, Dr. Boyd also reported that he first met the claimant on July 29, 2014, at which time it was apparent he had a personality disorder with traits from both narcissistic and schizoid types. He indicated that the claimant also suffers from a depressive disorder. He noted that the claimant was subsequently seen by a licensed counselor as well as a licensed psychiatric provider. Throughout his life, the doctor reported that the claimant's personality disorder has made personal interactions extremely difficult; he has never been employed or experienced close personal relationships; and his ability to interact in a normal workplace or tolerate normal workplace stressors is extremely impaired (Exhibit B9F/3).

Dr. Boyd also provided a medical source statement dated September 8, 2016, wherein he reported limitations that meet the Listings, including, but not limited to extreme difficulties in maintaining social functioning; extreme limitations in responding appropriately to changes in a routine work setting; extreme limitations in dealing with normal work stress; extreme limitations in maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and extreme limitations in getting another [sic] with others without exhibiting behavioral extremes. Dr. Boyd also opined that the claimant would be absent from work more than four days per month (Exhibit B10F).

While Dr. Boyd is a treating physician, the undersigned does not accord controlling weight to his opinions, but rather accords little weight, as the full extent of his limitations are not consistent with the record as a whole. In evaluating the doctor's opinions, the undersigned has considered all of the relevant factors, including the doctor's specialization, the doctor's explanation for the opinion, and the consistency of the opinion with the record as a whole (SSR 96-2p). In particular,

7

> Dr. Boyd is a primary care physician and not a mental health specialist or specialist in any other area. Moreover, Dr. Boyd's opinions are inconsistent with, and not supported by the substantial medical evidence of record, including, but not limited to the conservative and routine treatment, as well as the benign findings reported in Dr. Boyd's own treatment notes. Further, Dr. Boyd's assertions that the claimant is disabled and unemployable are findings reserved for the commissioner.

(Tr. 17–18).

The ALJ next assessed Dr. Christopher C. Ward's opinion concerning Plaintiff's mental health. (Tr. 18). Dr. Ward, who completed a psychological consultative examination of Plaintiff opined, in part, that Plaintiff presented as anxious and that Plaintiff described symptoms of depression and anxiety that may compromise his ability to work. (Tr. 315). The ALJ assigned Dr. Ward's opinion "little weight," explaining that it provided only "vague assertions" and because Dr. Ward "did not provide clear, vocationally relevant opinions consisting of a function by function assessment of the claimant's mental functioning." (Tr. 18).

Finally, the ALJ evaluated the opinions of the state agency consultants, who concluded that Plaintiff is not disabled. (*Id.*). The ALJ afforded these opinions "partial weight," because "these opinions were based on information contained in the record at the time of the State agency determinations in this case, and no medical records generated or provided after that date were considered by the State examiners." (*Id.*). The ALJ also noted that "additional medical evidence received in the course of developing the claimant's case for review at the administrative hearing level, including, but not limited to the hearing testimony and the claimant's subjective complaints, justifies a conclusion that the claimant's impairments are more limiting than was concluded by the state examiners." (*Id.*).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.*

*Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff raises one error to the Court. (Doc. 8). He argues that the ALJ reversibly erred in evaluating the opinion and medical evidence. Specifically, Plaintiff asserts that the ALJ erred in evaluating treating physician Dr. Boyd's opinion and "submitting his [sic] opinion for that of the treating and examining medical sources." (*Id*. at 8). As noted, Dr. Boyd opined that Plaintiff is unemployable and totally, permanently disabled. (*See, e.g.*, Tr. 335). The ALJ, however, assigned Dr. Boyd's opinion "little weight," finding that "the full extent of his limitations are not consistent with the record as a whole." (Tr. 17).

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case

record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

In this case, the ALJ first provided a detailed summary of Dr. Boyd's treatment history and then went on to evaluate the opinion in light of the record as a whole. (Tr. 17–18). The ALJ noted that she "considered all of the relevant factors, including the doctor's specialization, the doctor's explanation for the opinion, and the consistency of the opinion with the record as a whole." (Tr. 17 (citing SSR 96-2p)). The ALJ concluded that "[w]hile Dr. Boyd is a treating physician, the undersigned does not accord controlling weight to his opinions, but rather accords little weight, as the full extent of his limitations are not consistent with the record as a whole." (*Id.*).

In reaching her conclusion, the ALJ cited three primary reasons. First, the ALJ noted that Dr. Boyd is a primary care physician and not a mental health specialist. (*Id.*). Second, the ALJ found that Dr. Boyd's opinions are inconsistent with, and not supported by the substantial medical evidence of record, "including but not limited to the conservative and routine treatment, as well as the benign findings reported in Dr. Boyd's own treatment notes." (Tr. 18.). Finally, the ALJ noted that Dr. Boyd's opinion that Plaintiff is "disabled" and "unemployable" are findings reserved exclusively for the Commissioner. (*Id.*). The Court finds that the ALJ's explanation satisfies the good reasons standard.

As to the ALJ's first explanation, that Dr. Boyd does not specialize in mental health, the

Court finds that the ALJ did not commit reversible error. To start, Dr. Boyd's own records indicate that Dr. Boyd believed that Plaintiff would benefit from seeing a psychiatrist. (*See, e.g.*, Tr. 266 ("I [Dr. Boyd] would advocate for psychiatry consultation to confirm diagnosis [of schizoid personality disorder]."). In support of his argument, Plaintiff relies on the American Board of Family Medicine's website, asserting that Dr. Boyd "is authorized to opine regarding [his] mental status." (Doc. 8 at 9). The Court does not dispute this fact, especially "given the inclusion of behavioral sciences within this medical specialty." *Marcum v. Colvin*, No. 3:15-cv-245, 2016 WL 4086984, at *6 (S.D. Ohio Aug. 2, 2016). However, it is proper to weigh, as part of a comprehensive analysis, a treating source's specialization or lack thereof. *See* 20 C.F.R. § 416.927(C)(5) ("*Specialization*. We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). It is not as if, for example, the ALJ rested her conclusion solely on the fact that Dr. Boyd is not a psychiatrist. *See, e.g.*, *Marcum*, 2016 WL 4086984, at *6 (finding that substantial evidence did not support the ALJ's "decision to fully reject [treating physician's] opinions on the ground he is not a mental-health specialist."). Here, the ALJ properly weighed Dr. Boyd's specialty as part of her overall analysis.

Second, the Court finds that substantial evidence supports the ALJ's conclusion that Dr. Boyd's opinion is inconsistent with the record as a whole. Plaintiff asserts that the ALJ did not cite to the inconsistent substantial evidence. (Doc. 8 at 9–10). But the ALJ's decision shows otherwise. The ALJ had the following to say about Plaintiff's mental health records:

> Regarding the claimant's mental impairments, his symptoms were also not so severe that significant treatment was warranted and his treatment history, as well as his mental evaluation findings do not support the severity, frequency or intensity of limitations alleged by the claimant.

11

> Indeed, the record shows that the claimant did not require inpatient hospitalizations or emergency room treatment for his symptoms. Rather, the claimant's symptoms improved with medications and conservative, routine treatment. Additionally, his mental evaluation findings consistently showed findings that are not indicative of debilitating conditions. For example, his mental status evaluations showed some depression and anxiety, as well as transient finding of grandiosity, but his mental evaluation findings were generally within normal limits, including, but not limited to no auditory or visual hallucinations; no suicidal or homicidal ideations; he had adequate judgment; and he was able to answer questions appropriately (Exhibit B11F/1, 3, 7; B4F/11; B4F/14).
>
> Also, the claimant received some treatment with a counselor from August 5, 2014 to September 25, 2015; however, his treatment records show routine appointments with no significant findings or need for more intensive treatment. (See e.g. Exhibits B4F; B5F). Notably, the claimant's primary care physician also referred him for a psychiatric evaluation on February 9, 2015 (Exhibit B1F/1). However, on August 13, 2015, it was noted that the claimant quit seeing his psychiatrist because he did not want to take medications (Exhibits B11/F/11; B2F/1). Nevertheless, the record does not reflect significant psychiatric treatment during that time and his subsequent treatment records show that his symptoms were well managed by his primary care physician. For example, On October 2, 2017, the claimant reported that he thought Zoloft was helping but he did experience a little dizziness for the last week (Exhibit B11 F/1). Also, on May 17, 2017, the claimant also reported that he had not noticed mood changes, despite his mom dying of cancer (Exhibit B11 F/5).
>
> If the claimant's conditions were disabling, it would be expected that his treatment would be more aggressive, and the medical evidence of record would document more serious signs, findings, and symptoms.

(Tr. 16). The ALJ then went on to discuss Plaintiff's daily activities, concluding that they "are not consistent with someone who is disabled." (Tr. 17).

In light of the ALJ's thorough assessment of Plaintiff's mental health records, Plaintiff's arguments that the ALJ did not cite inconsistent record evidence and that the ALJ relied on only a few "normal" findings is not well taken. Rather, the Court finds that the ALJ considered all of the record evidence, including Plaintiff's examination records, his daily activities, and the opinion evidence, weighed the evidence in accordance with her role under the regulations, and decided the

case accordingly. *See Hardaway v. Sec'y of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987) (noting that it is the ALJ's "function to resolve conflicts in the evidence").

Plaintiff, however, claims that in relying on the lack of psychiatric treatment in the record, the ALJ effectively penalized him for failing to seek treatment. (Doc. 8 at 10–11). But Plaintiff has not presented "evidence to show [his] depression prevented [him] from seeking treatment." *Sandvoss v. Comm'r of Soc. Sec.*, No. 3:17-cv-1784, 2018 WL 4625564, at * 11 (N.D. Ohio Sept. 27, 2018) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283–84 (6th Cir. 2009) (holding that "[f]or some disorders, the very failure to seek treatment is simply another symptom of the disorder itself" but concluding that "there [was] no evidence in the record explaining [plaintiff's] failure to seek treatment during this half-year gap," and noting that "[a] 'reasonable mind' might therefore find that the lack of treatment during [that gap] indicated an alleviation of [plaintiff's] symptoms.")); *Burge v. Comm'r of Soc. Sec.*, No. 1:13-cv-87, 2013 WL 6837192, at *3 (N.D. Ohio Dec. 26, 2013) (holding that "to establish a severe mental impairment as an acceptable reason excusing a claimant's adherence to a medical regimen including prescription psychiatric medications, the record must contain evidence expressly linking noncompliance with the severe mental impairment.")). Here, while Plaintiff claims that the ALJ penalized him for failing to seek psychiatric treatment, he does not present evidence linking his mental health conditions with his failure to seek treatment, nor has the Court been able to find anything in the record to establish that Plaintiff's depression or anxiety prevented him from maintaining a course of treatment with a psychiatrist. Accordingly, the ALJ did not err in considering Plaintiff's lack of treatment when reaching her conclusion.

The ALJ likewise committed no reversible error in considering Plaintiff's activities of daily living. Plaintiff relies on evidence showing that he "rarely" did household chores and that his

13

mother typically prepared his meals. (Doc. 10 at 2). While the ALJ noted that Plaintiff's family members primarily performed household chores, the ALJ also considered that Plaintiff could tend to his daily hygiene and grooming and was able to relate well at the hearing to those with whom he interacted. (*See* Tr. 17). It was appropriate for the ALJ to take these factors into consideration as part of her overall analysis. *See* 20 C.F.R. § 404.15299(c)(3)(i) (providing that daily activities may be useful to assess nature and severity of claimant's symptoms); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 543–44 (6th Cir. 2007) (considering plaintiff's daily activities, including ability to take care of personal needs, performing light housework, and talking on the telephone).

Finally, the Court finds that the ALJ did not err in rejecting Dr. Boyd's opinion that Plaintiff is "disabled" and "unemployable" because those are findings reserved exclusively for the Commissioner. Indeed, the ALJ was not required to adopt Dr. Boyd's opinion that Plaintiff was unemployable or disabled because the determination of disability is reserved exclusively to the Commissioner. *See* 20 C.F.R. §416.927(d); *White v. Comm'r of Soc. Sec.*, No. 2:13-cv-934, 2015 WL 1197818, at *11 (S.D. Ohio Mar. 16, 2015) (holding that the ALJ provided legally sufficient reasons for rejecting treating physician's opinion, including the fact that the physician's conclusions that plaintiff was "disabled" and "unemployable" were not entitled to any weight because those issues are specifically reserved to the Commissioner) (citing *Bass v. McMahaon*, 499 F.3d 506, 511 (6th Cir. 2007)).

In sum, when considered in context, it is clear that the ALJ assigned little weight to Dr. Boyd's opinions based on relevant regulatory guidelines and the objective evidence as a whole. While there may be evidence in the record supporting Plaintiff's desired outcome, the ALJ provided sufficient detail to satisfy the good-reasons requirement and appropriately explained the disposition of the case to Plaintiff. *See Barncord v. Comm'r of Soc. Sec.*, No. 2:16-CV-389, 2017

14

WL 2821705, at *6 (S.D. Ohio June 30, 2017).

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 8) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:  May 30, 2019                                    /s/ Kimberly A. Jolson
                                                       KIMBERLY A. JOLSON
                                                       UNITED STATES MAGISTRATE JUDGE